I am obliged, respectfully, to register my disagreement with the conclusions announced in the opinion of Mr. Justice Blease in this case, for the reasons which follow:
I shall address my observations to what I consider the only ground upon which the plaintiff could even hope for an affirmance of the judgment appealed from, namely, that there was evidence in the case tending to show that the railroad company failed in its duty to exercise ordinary care in providing the deceased servant with a reasonably safe place in which to perform the service required of him. I think, for the reasons hereinafter stated, that the plaintiff has utterly failed to offer any evidence tending to establish negligence on the part of the railroad company in this respect, and that its motion for a directed verdict should have been granted.
The action is by the plaintiff, as administrator of the estate of W. Baylor Richards, who was killed under the circumstances hereinafter detailed, on September 5, 1920, at a time when he was in the employment of the defendant railroad company as a flagman. Whether, at the time of his death, he was acting within the course of his employment, is a material issue in the case. The case was tried before his Honor, Judge Henry, and a jury, in March, 1924, resulting in a verdict of $20,000 in favor of the plaintiff. From the judgment entered thereon the defendants (the railroad company and its engineer) have appealed.
The main issue in the case is whether the Circuit Judge should have granted the motion of the defendants for a directed verdict. The undisputed facts are these:
On April 27, 1920, Williams Bros. Construction Company and the defendant railroad company entered into a written contract, whereby the construction company engaged to fill in certain trestles on the line of the railroad company, known as the "Bishopville Branch." The construction company furnished *Page 153 
the locomotive, a train of dump cars, a steam shovel, all other machinery and equipment necessary for the performance of the work, and a force of laborers. The railroad company supplied a train crew, consisting of a conductor, an engineer, a flagman, and a brakeman, for the purpose of moving the train back and forth between the place of loading and the place of dumping; the loading at the excavation point and the unloading at the trestles being under the sole direction and control of the construction company.
In excavating and loading earth into the train of dump cars, the construction company used a Marion steam shovel. The steam shovel was placed upon a side track, parallel with the main line upon which the train of dump cars was placed. The steam shovel being for the time stationary, and swinging a dipper full of earth from the point of excavation to the dump cars, it became necessary, as a dump car would be filled, to move the train, so as to bring an empty car in position for loading. This movement was controlled by the engineer on the locomotive, upon a signal transmitted to him by some one at or near the steam shovel. The process was called "spotting," and although the construction company had a man specially employed as a "spotter" it appears that the conductor, the brakeman, and the deceased flagman, employed by the railroad company, were accustomed at times to act as "spotters."
On the date mentioned, about 2 o'clock p.m., the deceased was upon some part of the steam shovel intending to act as a "spotter." As the boom of the steam shovel swung around back to the excavation point, after having deposited a load of earth in a dump car on the main line, the deceased was caught between certain parts of the steam shovel and crushed to death. A description of the steam shovel appears necessary for an understanding of the accident. I will adopt, as Mr. Justice Blease has done in his opinion, in part, the description of the machine which appears in the argument of counsel for the appellant, as follows: *Page 154 
"The under frame consists of a platform mounted on wheels, similar in construction to a flat car. Extending from the rear of this platform towards the middle is located a sixty horse power steam boiler. Beyond this is a hoisting engine, the engine and boiler both being covered by a shelter or cab known as the shovel house. Each corner of the front of this shovel house rests on an upright post six inches square. A short distance in front of the shovel house is located a steel frame in the shape of the letter A; the apex of such frame extending upwards for a distance of ten feet. This frame is constructed of two wrought steel bars six inches square and is placed there for the purpose of stopping the boom of the shovel in its swing to right or left. Between the A-frame and the end of the platform is located `a hub cap known as a circle,' on which revolves a moving crane or boom. The arc on which this boom revolves is 210 degrees; that is, the boom can move in either direction 15 degrees more than a right angle from the center longitudinal line of the platform on which the machine is mounted. Running through a slot in the free end of the boom is a long movable metal bar, known as the dipper stick, attached to the bottom of which is a scoop or shovel. Mounted on the boom is a seat or saddle for the craneman, and also an engine known as the crowding engine, both of which revolve with it as it turns. While capable of moving through an arc of 210 degrees in a lateral direction, the boom itself is incapable of any motion in a vertical direction. So that, if operated to the full extent of its swing, it would come every time to the same place on the A-frame, which, it has been stated, was erected as a buffer to check its motion."
I do not think that this extract is complete, as, in my opinion, it omits certain exceedingly important details, which appear later in the argument of counsel, and are amply sustained by the evidence. In addition to the extract quoted, the following facts, in my opinion more completely setting forth the description, should appear:
(The situation will be perfectly understood by reference to photograph No. 3, Exhibit N, offered in evidence, a reproduction *Page 155 
of which the size of a page of the reports, should be incorporated in the report of the case.)